UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

| | | |
|---|---|---|
| DEWEY JONES, as Personal | ) | |
| Representative of the Estate of MARVIN | ) | |
| GLENN JONES, deceased, | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 3:08-cv-157-RLY-WGH |
| | ) | |
| MARVIN HEILMAN, in his official | ) | |
| capacity as WARRICK COUNTY | ) | |
| SHERIFF, WARRICK COUNTY | ) | |
| SHERIFF, WARRICK COUNTY, | ) | |
| WARRICK COUNTY BOARD OF | ) | |
| COMMISSIONERS and WARRICK | ) | |
| COUNTY JAIL, | ) | |
| Defendants. | ) | |

**ENTRY ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

In October of 2006, Warrick County Jail inmate Marvin Glenn Jones ("Jones")

became gravely ill. Over the course of approximately four days, his condition

deteriorated. His symptoms included rapid weight loss, increasing weakness,

constipation, profuse vomiting, and a "metallic" taste in his mouth. On two occasions, he

asked to be taken to the hospital, but those requests were denied. That Saturday evening,

for reasons that remain disputed, Jones was placed in solitary confinement. Over the next

thirteen hours, his condition worsened. At 1:30 p.m. the following day, jailers called for

an ambulance. By the time paramedics arrived, Jones was without a pulse and attempts to

resuscitate him failed. It was later determined that the cause of death was diabetic

ketoacidosis.

The plaintiff, Dewey Jones ("Plaintiff"), as personal representative of the estate of Jones, filed the present action against Marvin Heilman, in his official capacity as Warrick County Sheriff ("Sheriff"), the Warrick County Sheriff, Warrick County, Warrick County Board of Commissioners, and the Warrick County Jail ("Jail") (collectively "Warrick County" or "Defendants"). In the Plaintiff's Amended Complaint, Plaintiff alleges that Warrick County was deliberately indifferent to a serious medical need, and that Warrick County was negligent, failed to train its officers, and intentionally inflicted emotional distress on Jones and his family. Warrick County now moves for summary judgment on all claims asserted in Plaintiff's Complaint. For the reasons set forth below, the court **GRANTS** in part, and **DENIES** in part, Warrick County's motion.

## I.    Facts

### A.    Background

1.    Jones had been an inmate of the Jail since June 21, 2006, and was serving a three-year sentence at the Jail as an inmate of the Department of Corrections, following a probation revocation. (Affidavit of Marvin Heilman ("Heilman Aff.") ¶¶ 3-4).

2.    Upon being booked at the Jail, Jones was administered an inmate medical screening and was noted to be under doctor's care for depression and post-traumatic stress disorder, for which he was prescribed a number of medications. (Affidavit of Sarah Burgett ("Burgett Aff.") ¶ 3; Burgett Aff. Ex. A).

3.    Following the advice of a psychiatrist from the Southwestern Indiana Mental

Health Center, who performed an evaluation of Jones' mental health on September 11, 2006, and with Jones' consent, Jones' prescription for one of his medications, Gabapentin,[1] was discontinued. (Burgett Aff. ¶¶ 4, 5; Burgett Aff. Exs. B, C).

4.      Sarah Burgett, RN ("Nurse Burgett"), is a nurse employed at the Jail. Nurse Burgett works from 7:00 a.m. to 3:00 p.m. Monday through Friday, but does not work on weekends. (Deposition of Sarah Burgett ("Burgett Dep.") at 8, 9, 20; Deposition of Marvin Heilman ("Heilman Dep.") at 20). Thus, the decision as to how to proceed with an inmate's medical complaint over the weekend was left to the individual jailer's discretion. (Heilman Dep. at 94, 98). Nurse Burgett testified that if a jailer believed that an inmate's condition was "serious or life threatening," the jailer could make the decision to take the inmate to the hospital. (Burgett Dep. at 17).

5.      Inmate Medical Request forms ("IMRs"), which were submitted over a weekend, were put into a box on Nurse Burgett's desk for her to view on her next return to the Jail. (*Id.* at 30; Burgett Dep. at 20).

   **B.      Jones Complains of Being Ill**

6.      Approximately a week before Jones' death, Jones fell ill, and suffered a drastic decline in his appetite. (Deposition of David Stutsman ("Stutsman Dep.") at 12). David Stutsman ("Stutsman"), one of Jones' cell mates, testified that Jones was

---

[1] Gabapentin is the generic name for Neurontin, a medication used to treat such conditions as seizures or nerve pain.

weak, complained of a "metallic" taste in his mouth, vomited repeatedly, and left a substance that "didn't look natural" in the commode, and only arose from his bunk to receive his medications and to "pick" at his food. (*Id.* at 13-14).

7.    On Friday, October 20, 2006, at approximately 8:00 a.m., Jones complained to Nurse Burgett (who was dispensing medication at the time) that he had been nauseated and constipated, that he had a "metallic" taste in his mouth and that his tongue hurt. (Burgett Aff. ¶ 6; Burgett Aff. Ex. D).

8.    In response to his complaint, Nurse Burgett gave Jones the Milk of Magnesia he requested for his constipation and informed him that his tongue pain could be the result of the numerous medications he was taking or the discontinuation of his Gabapentin. (Burgett Aff. ¶ 7).

9.    On the evening of Saturday, October 21, 2006, Jones told Jail Officer Ryan Ruff ("Officer Ruff") that he had been vomiting and losing weight and wanted to go to the hospital.[2] In fact, by the time of that evening's medication pass, around 8:00 p.m., Jones had become so weak that he needed assistance simply to walk down the hall. (Stutsman Dep. at 15).

10.   In addition, Jones submitted a written IMR in which he described his symptoms as rapid weight loss, a bad taste in his mouth, loss of appetite, inability to go to the bathroom, and ever-increasing weakness. (Burgett Aff. Ex. E).

---

[2] Cell mate Richard Thomas testified that he was present when Jones asked to go to the hospital two times that day. (Affidavit of Richard Thomas ("Thomas Aff.") ¶ 8).

11.	In response to Jones' complaint, Officer Ruff called Nurse Burgett at home and communicated to her Jones' complaints and request to go to the hospital. (Heilman Aff. ¶ 6; Heilman Aff. Ex. B; Burgett Aff. ¶ 9; Burgett Aff. Ex. F).

12.	Nurse Burgett indicated that she believed Jones either had the flu or was experiencing effects from the discontinuation of the Gabapentin. She said that he could take a Phenergan pill for nausea if he wanted one and told Officer Ruff to continue watching him. (Burgett Aff. ¶ 10; Burgett Aff. Ex. F). Officer Ruff offered to give Jones a Phenergan, but he declined the medication and went back to sleep. (Burgett Aff. ¶ 11; Burgett Aff. Ex. G).

13.	In response to what was communicated to her about Jones, Nurse Burgett stated that she did not call the regular jail physician, James Mooney, M.D. ("Dr. Mooney"), as she was aware that he was out of town on vacation. (Burgett Dep. at 18, 35, 36). So, Nurse Burgett alleges that she called Sarah Fulks, M.D. ("Dr. Fulks"), the emergency room physician on duty at the Warrick Hospital, to discuss Jones' case with her. Nurse Burgett further asserts that she discussed Jones' condition in detail, and also her opinion that Jones' complaints and symptoms were due to his withdrawal from the drug Neurontin, which had been discontinued. (*Id*. at 18, 25-27, 35). Nurse Burgett maintains that Dr. Fulks agreed with her assessment, and so the Nurse instructed the jailers to restart Jones on the drug's generic form, Gabapentin. (Burgett Aff. ¶ 14; Burgett Aff. Ex. I).

14.	In contrast to Nurse Burgett's testimony, Dr. Fulks testified that she never received

a call from Nurse Burgett (or anyone else) about Jones at this time. (Affidavit of Sarah Fulks ("Fulks Aff.") ¶¶ 1, 15-17). In fact, Dr. Fulks testified that, had she been contacted and informed of the symptoms Jones listed in his IMR (rapid weight loss, bad taste in mouth, loss of appetite, constipation, and continued weakness), she would have told the caller that Neurontin "could not be responsible for all of those symptoms and that the inmate would need to be brought immediately to the emergency room for assessment." (*Id.* ¶ 18).

15.    Later that evening, Nurse Burgett called the Jail and spoke with Officer David Morris ("Officer Morris"), who said that Officer Ruff had just finished briefing him about Jones and had gone home. (Affidavit of David Morris ("Morris Aff.") ¶ 14; Morris Aff. Ex. I). Nurse Burgett told Officer Morris that the doctor at Warrick Hospital emergency room suggested giving Jones the Gabapentin, told him to retrieve the pills from Jones' property locker, and explained what the pills looked like to ensure Jones was given the proper medication. She told Officer Morris that Jones should take one pill that night and three more the following day. (Burgett Aff. ¶ 14; Burgett Aff. Ex. I).

### C.    Jones is Placed in Isolation

16.    As Officer Morris and Jones were retrieving his medication from his locker, Officer Morris alleges that he saw a cigarette hanging out of Jones' waistband, and that this conduct warranted him five days in solitary confinement pursuant to the Jail Rules. (Morris Aff. ¶ 7; Morris Aff. Ex. B). (The Jail Rules classify smoking

as a minor offense.  (Heilman Dep. at 42)).

17.    Stutsman testified that he overheard one of the jail officers tell Jones that he had

        spoken to the Jail Nurse, and, while Jones would not be taken to the hospital, they

        would place him in isolation for purposes of providing him a more careful medical

        watch. (Stutsman Dep. at 19-21).

18.    Under the Jail's medical watch policy, a clipboard would be hung outside the

        isolation cell.  Every fifteen (15) minutes, a jailer was expected to check in on the

        inmate, make sure he was doing well or find out if he needed anything and indicate

        on the clipboard that he had done so.  (Deposition of George Howes ("Howes

        Dep.") at 28, 31; Deposition of Jeremy Holder ("Holder Dep.") at 18-19.  There is

        no evidence in the record that a clipboard was maintained outside Jones' cell or

        that a jailer checked on him every fifteen minutes, as required.

19.    Michael Hardman ("Hardman"), a police officer with over twenty-eight (28) years

        of experience in all types of investigations and a certified computer examiner, was

        retained by Plaintiff's counsel to examine the hard drive and retrieve any recorded

        surveillance video of the interior of the isolation cell as well as video of the

        hallway[3] that ran outside of that cell.  (Affidavit of Michael Hardman ("Hardman

        Aff.") ¶¶ 4-6).

20.    Of the approximately eighteen (18) hours of recorded video of Jones in his

_____

        [3] The recorded surveillance video of the hallway outside Jones' cell was recorded over
approximately thirty (30) days after Jones' death.  (Deposition of Sherry Williams at 12-14).

isolation cell, Hardman testified that he could only find three (3) instances in which Jones was checked on.  (*Id*. ¶ 25).

21.     The first of these occurred at around 1:36 a.m. on Sunday, October 22, 2006, when Jones was found to have vomited in his cell.  One of the jail trustees, Terry Lindsey ("Lindsey"), was sent to clean it up.  (Affidavit of Terry Lindsey ("Lindsey Aff.") ¶ 6).  According to Lindsey, the vomit was clear in color and was in and around the toilet and on the floor surrounding the toilet.  (*Id*. ¶ 11).

22.     At around 9:10 a.m. Sunday morning, Jones appeared to fall from his bunk to the floor of the isolation cell.  Jones then got back on his bunk and appeared to fall on the floor again.  A jailer entered the cell, talked to Jones, and helped him off the floor onto his bunk.  (Hardman Aff. ¶ 28).

23.     At approximately 10:50 a.m., Jones is seen appearing to rub his chest, and a jailer, later identified as Jail Officer Kenneth Scales ("Officer Scales"), enters the cell to speak with him and apparently give him some medication.  (*Id*. ¶ 29).  Officer Scales testified that Jones was hyperventilating and panting, so he tried to calm him down with deep breathing exercises.  Officer Scales also gave Jones a Mountain Dew to drink.  (Deposition of Kenneth Scales at 6-7).

24.     After leaving Jones' cell, Officer Scales placed a call to Nurse Burgett and left a message for her to call him.  (Affidavit of Kenneth Scales ("Scales Aff.") ¶ 4).  Nurse Burgett returned his phone call and informed him that jail officers should continue to give Jones the Gabapentin as instructed.  (Burgett Aff. ¶ 15; Burgett

Aff. Ex. J).

25.   In keeping with Nurse Burgett's orders, Officer Scales gave Jones another dose of Gabapentin at noon.  (Scales Aff. ¶ 6).  Officer Scales testified that Jones was very sleepy but said he was fine.  (*Id*.).

**D.     Jones Passes Away**

26.   Inmate and Jail Trustee Lindsey, who was assigned to deliver Jones' lunch on Sunday, testified that he placed Jones' lunch tray in the slot in his door and called to Jones that it was time for lunch.  Jones was lying face down on his bunk and did not respond to Lindsey.  Lindsey then told Officer Scales that Jones had not responded.  (Lindsey Aff. ¶ 13).

27.   After lunch, Lindsey returned to Jones' cell to retrieve the tray.  Jones' tray was untouched, and Jones still lay face down on the bunk, not having moved since Lindsey placed his tray in his cell slot.  (*Id*. ¶ 15).  The Jail was then placed on lock-down.  (*Id*.).

28.   Around 1:30 p.m. on October 22, 2006, Jones was found unresponsive and without a pulse at either his wrist or neck.  Numerous jailers testified that they attempted to resuscitate him, by performing CPR, but to no avail.  (Affidavit of George Howes ¶ 3; Affidavit of Jeremy Holder ¶¶ 5-6).

29.   Jones was pronounced dead, and an autopsy later determined that his death was caused by diabetic ketoacidosis, a complication of diabetes.  (Heilman Dep. at 19).

30.   According to Dr. Fulks, and the Jail's physician, Dr. Mooney, diabetic

ketoacidosis is a very serious medical condition. Although it can be treated

successfully if caught early, when left untreated, it can cause irreparable harm, and

even lead to death. (Deposition of James Mooney at 26-28; Fulks Aff ¶¶ 24-26;

*see also* Affidavit of Blanche Borzell, M.D. ("Borzell Aff.") ¶¶ 4-5 (Plaintiff's

expert regarding Jones' medical care and death at the Jail)).

31.    These doctors have also opined that the symptoms which Jones demonstrated are

classic indicia of diabetic ketoacidosis, or at least of a need to be taken to the

emergency room for immediate medical assessment. (Mooney Dep. at 29-30;

Fulks Aff. ¶¶ 18, 29; Borzell Aff. ¶ 8; Borzell Aff. Ex. B).

### E.    The Jailers' Training

32.    According to Jail Commander, Kae Baker ("Commander Baker"), to whom the

Sheriff has delegated training as to medical matters, the Indiana Department of

Correction requires that the Jail provide training on first aid and CPR, "but [the

Jail] go[es] up and above that." (Deposition of Kae Baker ("Baker Dep.") at 39).

33.    The Jail has a medical training manual known as the "review book," which was

created for use by the jail correctional staff. (*Id*. at 31-33). New jailers are trained

from this review book, and all jailers are required to review it annually, and to sign

off indicating they have done so. (Heilman Dep. at 62-63; Baker Dep. at 31, 38-

40).

34.    One of the medical issues addressed in the review book is "Understanding Diabetic

Emergencies Hyperglycemia and Hypoglycemia." (Plaintiff's Ex. 31).

35.    The jailers in this case testified, however, that they had no training or familiarity

with the symptoms or effects of hyperglycemia (high blood sugar) or diabetic

ketoacidosis.  (Holder Dep. at 33, 35; Howes Dep. at 42; Morris Dep. at 17; Ruff

Dep. at 19-20).

### F.    Notice of Tort Claim

36.    On February 22, 2007, the Plaintiff, through his attorney, Robert John ("Mr.

John"), served a Notice of Tort Claim for Damages addressed to the Warrick

County Commissioners.  (Defendants' Ex. G).

37.    On May 3, 2007, Scottsdale Indemnity Company ("Scottsdale") wrote a letter to

Mr. John in which Scottsdale identified itself as the provider of "Law Enforcement

Liability Coverage to Warrick County" and acknowledged the submission of the

Notice of Claim for Damages and its receipt on February 26, 2007.  (Affidavit of

Robert John ("John Aff."), Ex. A).

38.    On May 15, 2007, a second letter was issued by Scottsdale, noting that it had

conducted an investigation into Jones' death at the Jail, and that the "investigation

did not develop any negligence on the part of our insured leading to the death of

Mr. Jones."  (*Id*., Ex. B).

39.    A copy of this letter was sent to the Sheriff.  (*Id*.).

## II.    Summary Judgment Standard

A party is entitled to summary judgment "if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there

is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fᴇᴅ. R. Cɪᴠ. P. 56(c). A fact is "material" if it is outcome determinative. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "genuine" where the evidence "is such that a reasonable jury could return a verdict for the non-moving party." *Id.*

In determining whether a genuine issue of material fact exists, the court must view the record and all reasonable inferences in the light most favorable to the non-moving party. *Nat'l Soffit & Escutcheons, Inc. v. Superior Sys., Inc.*, 98 F.3d 262, 264 (7th Cir. 1996). While the moving party bears the burden of demonstrating the "absence of evidence on an essential element of the non-moving party's case," *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986), the non-moving party may not simply rest on the pleadings, but "must affirmatively demonstrate by specific factual allegations that a genuine issue of material fact exists for trial." *Id.* If the non-moving party fails to make a sufficient showing on an issue to which he has the burden of proof, the moving party is entitled to judgment as a matter of law. *Ripberger v. W. Ohio Pizza, Inc.*, 908 F.Supp. 614, 617 (S.D. Ind. 1995) (citing *Celotex Corp.,* 477 U.S. at 323).

## III.    Discussion

### A.    Section 1983

The Plaintiff brings two Section 1983 claims – a deliberate indifference claim and a failure to train claim. These claims are brought not only against the Sheriff and the Warrick County Sheriff, but also against Warrick County, the Warrick County Jail, and

12

the Warrick County Board of Commissioners. Defendants contend that the Warrick County Jail, Warrick County, and the Warrick County Board of Commissioners are not proper defendants to the Plaintiff's claims. Plaintiff poses no objection, and the court agrees. The Warrick County Jail does not have a separate legal existence, and Warrick County and Warrick County Board of Commissioners have no responsibility for the policies of the Jail or the conduct of the Jail's employees. Accordingly, Defendants' motion for summary judgment as to Warrick County, the Warrick County Jail, and the Warrick County Board of Commissioners is **GRANTED**.

The court also notes that Marvin Heilman, in his official capacity as the Sheriff of Warrick County, and the Warrick County Sheriff, have the same legal existence. *McMillian v. Monroe County, Alabama*, 520 U.S. 781, 785 n.2 (1997) (finding that an official capacity suit is the same as a suit against the entity of which the officer is an agent). Thus, Plaintiff's claims against the Warrick County Sheriff are superfluous. The court requests Plaintiff's counsel to show cause why the Warrick County Sheriff should not be dismissed as superfluous.

The court now turns to the Plaintiff's Section 1983 deliberate indifference claim against the Sheriff and the Warrick County Sheriff (collectively "Sheriff").

### 1. Deliberate Indifference

Section 1983 creates a federal cause of action for "the deprivation, under color of [state] law, of a citizen's rights, privileges, or immunities secured by the Constitution and laws of the United States." *Spiegel v. Rabinovitz*, 121 F.3d 251, 254 (7th Cir. 1997).

Plaintiff asserts that the Sheriff was deliberately indifferent to Jones' serious medical need during his incarceration in the Jail.  Because Jones was a prisoner rather than a pre-trial detainee during the relevant time period, his claims are properly analyzed under the Eighth Amendment's Cruel and Unusual Punishment Clause.  *Farmer v. Brennan*, 511 U.S. 825, 828 (1994); *Hayes v. Snyder*, 546 F.3d 516, 522 (7th Cir. 2008); *Lee v. Young*, 533 F.3d 505, 509 (7th Cir. 2008).

In order to prevail on a deliberate indifference claim, the Plaintiff must first show that Jones' medical condition was objectively serious.  *Thomas v. Cook County Sheriff's Dep't*, 588 F.3d 445, 452 (7th Cir. 2009) (citing *Hayes*, 546 F.3d at 522).  "An objectively serious medical condition is one that 'has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would perceive the need for a doctor's attention.'" *Id*. (quoting *Hayes*, 546 F.3d at 522).  Next, the Plaintiff must show that prison officials "'acted with a sufficiently culpable state of mind.'" *Id*. (quoting *Hayes*, 546 F.3d at 522).  This requires the Plaintiff to demonstrate that: (1) prison officials subjectively knew of the risk to Jones' health and (2) disregarded an excessive risk that a lack of treatment would pose to Jones' health.  *Id*. (citing *Collins v. Seeman*, 462 F.3d 757, 761 (7th Cir. 2006)).  "'[A] factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.'" *Hayes*, 546 F.3d at 522 (quoting *Farmer*, 511 U.S. at 842).  Finally, because the Plaintiff's claim is against the Sheriff in his official capacity, the Plaintiff must also show that the injuries resulted from a policy, custom, or practice of the Sheriff in effect at the Jail.  *See Perkins*

*v. Lawson*, 312 F.3d 872, 875 (7th Cir. 2002) ("In order to prevail on an official capacity suit against the sheriff, the plaintiffs must show that an official policy or custom caused the injury.").

### a.    Serious Medical Need

In analyzing this first prong, the court may use the benefit of hindsight – meaning, the court looks to how serious the condition actually turned out to be. *Collignon v. Milwaukee County*, 163 F.3d 982, 989 (7th Cir. 1999) (noting that from an "after-the-fact vantage point," the decedent's mental illness was very serious); *Gutierrez v. Peters*, 111 F.3d 1364, 1370 (7th Cir. 1997) (noting that the court considers "whether any such harm actually resulted from the lack of medical attention"). Diabetic ketoacidosis is a complication of diabetes that occurs when the body has an insulin insufficiency. According to the Center for Disease Control, diabetic ketoacidosis is a potentially life-threatening event. (*See* Plaintiff's Ex. 29; *see also* Fulks Aff. ¶ 25). In this case, it is undisputed that it was the cause of Jones' death.

Further, it was obvious, even to the jail officials, that Jones was gravely ill and in need of emergent care. (Lindsey Aff. ¶ 9; Thomas Aff. ¶ 9; Stutsman Dep. at 7-9, 14-15; Stutsman Dep. Ex. 40 at 2-5, 8). Even the Sheriff concedes that Jones' health condition was objectively serious. Accordingly, the court finds that Jones had an objectively serious medical need.

### b.    Deliberately Indifferent

In analyzing the second prong, the Plaintiff need not show that jail officials

15

"literally ignored" Jones' complaints of severe pain and weakness; "rather, [the Plaintiff] must show only that the defendants' responses were so plainly inappropriate as to permit the inference that the defendants intentionally or recklessly disregarded his needs." *Hayes*, 546 F.3d at 524.

The evidence in this case is replete with instances in which Jail officials were made aware of Jones' serious health condition, yet failed to heed his requests to be seen by a doctor or other medical professional. Although it is undisputed that the Jail officials did not know that Jones suffered from diabetes, it should have been obvious to the Jail officials that Jones was in need of medical attention. Jones had been vomiting for at least four days, had lost weight, was unable to eat, and in a severely weakened state. On Saturday, he specifically requested medical attention on three separate occasions, including once in writing, and needed assistance from his cell mate, Stutsman, to walk down the hall and receive his medicines from one of the jailers (who could not have failed to notice Stutsman's assistance). Yet, his requests were denied. Instead, correctional staff simply contacted Nurse Burgett by phone to discuss Jones' situation.

By the next morning, Jones' condition continued to deteriorate. Jones had to be lifted from the floor to his bunk, and was found hyperventilating, panting, and rubbing his chest. Still, Jones was not transported to the hospital. Rather, Jones was taken to an isolation cell.

While in isolation, the evidence reflects that Jones was not properly monitored. Hardman testified that, in his review of over eighteen hours of video tape of Jones' cell,

he only saw a Jail officer check on him three times.  Moreover, Jail Trustee Lindsey testified that Jones was unresponsive and unmoving throughout the entire lunch period on Sunday, and that this fact was twice brought to a jailer's attention.  This evidence is supported by the fact that the Sheriff did not produce a chart or clipboard detailing the required checks on Jones every fifteen (15) minutes as mandated by the Jail's medical watch policy.

Viewing the evidence in the light most favorable to the Plaintiff, the court finds that there exists a genuine issue of material fact as to whether the Jail officials' responses to Jones' continued medical complaints were "so plainly inappropriate" as to create the inference that the Sheriff knew of and consciously disregarded a known risk to Jones' health.

### c.    Causal Connection

Diabetic ketoacidosis is a serious health condition that is easily treatable if timely medical care is provided.  As the Sheriff does not advance an argument on causation, the court finds the evidence is sufficient to present a question of fact as to whether the Defendants' deliberate indifference caused harm to Jones.

### d.    Policy, Custom, or Practice

As noted above, to sustain the Plaintiff's claim against the Sheriff, the Plaintiff must demonstrate that some custom, policy, or practice caused his injury.  *Perkins*, 312 F.3d at 875.  This means that the Plaintiff must point to an express policy, a widespread practice that is "so well-settled" as to amount to a policy, or an act by someone with

policy-making authority that caused his injury. *Grieveson v. Anderson*, 538 F.3d 763, 773 (7th Cir. 2008). Ultimately, the court must determine whether the Plaintiff has presented "enough evidence of custom and practice to permit an inference that the County has chosen an impermissible way of operating." *Id*. at 774 (quoting *Calhoun v. Ramsey*, 408 F.3d 375, 381 (7th Cir. 2005)).

Here, the Plaintiff relies upon the following four customs, practices, or policies of the Jail: (1) there is no medical staff on-site during the weekends, (2) there is no coverage when the jail physician is on vacation; (3) there is no medical staff available to evaluate an IMR submitted during the weekends; and (4) the determination as to whether an inmate's medical condition warranted medical attention was left up to the discretion of the Jail officials (who admittedly have no medical training).

The testimony presented is sufficient to raise a genuine issue of material fact as to whether these customs, practices, or policies caused Jones' death. Indeed, there is no evidence that Jones was evaluated by any medical professional on Saturday or Sunday, even though his condition deteriorated precipitously.

In addition, the evidence suggests that Jones' IMR was not timely received or reviewed. Physicians in this case testified that the symptoms that Jones complained of in his IMR were consistent with a finding of diabetic ketoacidosis. Moreover, they have all asserted that the disease is often fatal if left untreated, but can be managed by appropriate and timely treatment. Finally, Nurse Burgess testified that, had she been sufficiently apprised of Jones' symptoms and complaints, she would have spoken to him personally to

evaluate his situation. (Burgett Dep. at 20-21). Given this evidence, the court finds that a jury could conclude that the policy of delaying receipt and review of IMRs was the cause of Jones' untimely death. Accordingly, Warrick County's motion for summary judgment on the Plaintiff's Section 1983 deliberate indifference claim is **DENIED**.

### 2. Section 1983 Failure to Train

Plaintiff asserts that the Sheriff had in place municipal policies, customs, or practices that caused Jail officers to be inadequately trained. The Sheriff may be liable for failing to train its Jail officers only if "the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). "This proof can take the form of either (1) failure to provide adequate training in light of foreseeable consequences; or (2) failure to act in response to repeated complaints of constitutional violations by its officers." *Sornberger v. City of Knoxville, Ill.*, 434 F.3d 1006, 1029-30 (7th Cir. 2006) (citing *City of Canton*, 489 U.S. at 390 & n.10). "Only where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality – a 'policy' as defined by our prior cases – can a city be liable for such a failure under [Section 1983]." *City of Canton*, 489 U.S. at 389. In sum, to successfully allege a failure to train Section 1983 claim, the policymakers must have "actual or constructive notice that a particular omission is likely to result in constitutional violations." *Cornfield by Lewis v. Consolidated High Sch. Dist. No. 230*, 991 F.2d 1316, 1327 (7th Cir. 1993).

The evidence reflects that the jailers were required to sign a sheet attesting that

they had reviewed the Jail's training book containing information on "Understanding Diabetic Emergencies Hyperglycemia and Hypoglycemia," (*see* Plaintiff's Ex. 31), on an annual basis. Jail Officers Holder, Howes, Ruff, and Morris, each of whom had contact with Jones during the relevant time period, testified that they had no idea what diabetic ketoacidosis was, nor any familiarity with the terms hyperglycemia or hypoglycemia. These officers also had no memory of ever having any training with respect to these medical conditions. (*See* Holder Dep. at 33-35; Howes Dep. at 42; Morris Dep. at 17-19; Ruff Dep. at 19-20). This evidence, viewed in the light most favorable to the Plaintiff, creates an inference of a policy or practice of inadequate training at the Jail with regard to recognizing and responding to common diabetic complications.

As there is evidence in the record of such a policy or practice, the issue turns on whether the Sheriff's failure to train could result in the type of constitutional injury that Jones suffered. Based on this record, the court finds that a reasonable jury could conclude that it was reasonably foreseeable that a tragic incident, such as the one that occurred here, could happen in light of the Sheriff's failure to train its officers to recognize the signs and symptoms of diabetic ketoacidosis, or the signs and symptoms associated with a blood sugar disorder. Accordingly, Warrick County's motion for summary judgment on the Plaintiff's Section 1983 failure to train claim is **DENIED**.

B.      **State Law Claims**

In addition to the Section 1983 claims, Plaintiff's Amended Complaint asserts claims for relief arising under Indiana state law, namely, negligence (Counts II and III),

negligent training (Count V), and for the intentional infliction of emotional distress (Count IV). Warrick County contends that Plaintiff failed to provide proper notice to the Sheriff pursuant to the Indiana Tort Claims Act ("ITCA") and that therefore, the state law claims must be dismissed.

The ITCA provides that a claim against a political subdivision, like the Sheriff of Warrick County, is barred unless the claimant files notice with that subdivision within 180 days following an incident. IND. CODE § 34-13-3-8 (2007). Pursuant to statute, the notice must contain the following information:

> The notice . . . must describe in a short and plain statement the facts on which the claim is based. The statement must include the circumstances which brought about the loss, the extent of the loss, the time and place the loss occurred, the names of all persons involved if known, the amount of the damages sought, and the residence of the person making the claim at the time of the loss and at the time of filing the notice.

IND. CODE § 34-13-3-10. "The purpose of the notice requirement is to provide the municipality the opportunity to investigate the facts surrounding an accident so that it may determine its liability and prepare a defense." *Hasty v. Floyd Mem'l Hosp.*, 612 N.E.2d 119, 123 (Ind. Ct. App. 1992) (citing *Burggrabe v. Bd. of Public Works of City of Evansville*, 469 N.E.2d 1233, 1235-36 (Ind. Ct. App. 1984). Substantial compliance with the notice requirements may excuse technical violations of the statute provided that the purpose of the requirement is satisfied. *Id.* "'Substantial compliance focuses on the nature of the notice itself, and is concerned with the extent to which the form, content, and timing of the notice complies with the requirements of the notice statute.'" *Brown v.*

*Alexander*, 876 N.E.2d 376, 382 (Ind. Ct. App. 2007) (quoting *Fowler v. Brewer*, 773

N.E.2d 858, 863 (Ind. Ct. App. 2002)).  Substantial compliance was adopted by the

Indiana Supreme Court to prevent the notice requirement from becoming "a trap for the

unwary where [its] purpose has in fact been satisfied."  *Galbreath v.City of Indianapolis*,

255 N.E.2d 225, 229 (1970).

Indiana law provides that the Sheriff of Warrick County is a public employee to

whom notice must be given.  *Hupp v. Hill*, 576 N.E.2d 1320, 1326 (Ind. Ct. App. 2001)

(citing *Teague v. Boone*, 442 N.E.2d 1119, 1120 (Ind. Ct. App. 1982)); *Settles v. Herman*,

2004 U.S. Dist. LEXIS 25469, at *6 (N.D. Ind. Dec. 15, 2004).  Here, it is undisputed that

the Plaintiff sent the Notice of Claim to the Warrick County Commissioners rather than

the Sheriff.  The issue presented is whether the Plaintiff substantially complied with the

notice provisions, such that the notice is effective against the Sheriff.

Indiana cases on this subject help guide the court's analysis.  In *Settles*, the

plaintiff gave notice to the County rather than the Sheriff.  2004 U.S. Dist. LEXIS 25496,

at *6.  Even though the notice was forwarded to the Sheriff, the district court held that,

because the notice did not identify the Sheriff as a potential defendant, the plaintiff did

not put the Sheriff on notice of a claim against him, and his substantial compliance

argument failed.  *Id*. at *7-8.  Similarly, in *Hupp*, the plaintiff gave notice to the County

Commissioners rather than the Sheriff.  576 N.E.2d at 1326. The plaintiff argued that he

had substantially complied with the notice requirement because the Sheriff had actual

knowledge of the underlying incident.  *Id*.  The Indiana Court of Appeals disagreed,

stating that "Sheriff Hill's knowledge of the search does not amount to notice of [the plaintiff's] claim." *Id*.

Here, the Plaintiff contends that because Scottsdale sent the Plaintiff's counsel correspondence denying the Plaintiff's Notice of Claim for Damages against the "Warrick County Commissioners, as Governing Body of Warrick County," (*see* Defendants' Ex. G), and copied the Sheriff, that the Plaintiff substantially complied with the requirement of giving notice to the Sheriff. In support of the Plaintiff's argument, the Plaintiff cites to *City of Tipton v. Baxter*, 593 N.E.2d 1280 (Ind. Ct. App. 1992) and *Porter v. Fort Wayne Comm. Sch.*, 743 N.E.2d 341 (Ind. Ct. App. 2001), where the Indiana Court of Appeals found that notice to the defendants' insurers constituted adequate notice to the defendants. These cases are distinguishable from the present case because in both *Tipton* and *Porter*, the claimants communicated directly with the defendants' insurers, with clear intent to address claims against the proper defendants. Here Scottsdale was not responding to communication directly from the Plaintiff with respect to a claim against the Sheriff. Rather, Scottsdale Indemnity was responding to a claim against Warrick County. (*See* Defendants' Ex. G). Moreover, the communication from Scottsdale upon which the Plaintiff's rely (that copied the Sheriff) clearly provides that the "insured" is "Warrick County, IN." (John Aff. Exs. A, B). Thus, unlike the insurers in *Tipton* and *Porter*, Scottsdale was responding to a claim against its insured, "Warrick County, IN," and not to a claim the Plaintiff may have intended to make against the Sheriff, a separate and distinct legal entity. Accordingly, the court finds that the Plaintiff did not give notice to

the Sheriff, and thus, his state law claims against the Sheriff in his official capacity are barred.

## IV.    Conclusion

For the reasons set forth above, the Defendants' Motion for Summary Judgment (Docket # 38) is **GRANTED** in part, and **DENIED** in part.  Specifically, the Defendants' motion is **GRANTED** with respect to Plaintiff's state law claims against Marvin Heilman, in his official capacity as the Warrick County Sheriff and the Warrick County Sheriff, and **DENIED** with respect to Plaintiff's federal deliberate indifference and failure to train Section 1983 claims against Marvin Heilman, in his official capacity as the Warrick County Sheriff and the Warrick County Sheriff.  In addition, Defendants' motion is **GRANTED** with respect to Plaintiff's state and federal claims against Defendants, Warrick County, Warrick County Board of Commissioners, and Warrick County Jail. The court further **ORDERS** the Plaintiff to show cause why the Warrick County Sheriff should be not dismissed as superfluous within ten (10) days of the date of this Entry.


**SO ORDERED** this <u>29th</u>  day of September 2010.


_____
RICHARD L. YOUNG,  CHIEF JUDGE
United States District Court
Southern District of Indiana

Electronic Copies to:

William W. Drummy
WILKINSON GOELLER MODESITT WILKINSON & DRUMMY
wwdrummy@wilkinsonlaw.com

William S. Frankel IV
WILKINSON, GOELLER, MODESITT, WILKINSON & DRUMMY
wsfrankel@wilkinsonlaw.com

Robert  John
ROBERT JOHN & ASSOCIATES, PC
rnjohn@juno.com

Lane C. Siesky
SIESKY LAW FIRM, PC
lane@sieskylaw.com